UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

CHEN, J.

---------------------------------x

SAMMY RODGERS,

                Plaintiff,

  v.

AMERICAN AIRLINES INC.,

                Defendant,

ASSOCIATION OF PROFESSIONAL
FLIGHT ATTENDANTS,

           Nominal Defendant.

---------------------------------x

REYES, M.J.
CIVIL NO.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

☆  FEB 04 2016  ☆

LONG ISLAND OFFICE

**CV16-00731**

 

AND NOW COMES Plaintiff Sammy Rodgers and files this, his Complaint:

### Parties

1. Plaintiff is Sammy Rodgers ("Rodgers"). Rodgers is a Citizen of the State of Arkansas, residing at 2201 South Broadway Street, Little Rock, Arkansas 72206.

2. The defendant is American Airlines, Inc. ("AA"), a Delaware corporation, registered itself with the New York Secretary of State as a foreign corporation doing business in New York. AA maintains offices and operates routes through New York via the LaGuardia Airport and the JFK Airport. AA lists C T Corporation System, 111 Eighth Avenue, New York, NY 10011 as its registered office in New York.

1

3. The second defendant, sued nominally as an indispensable party, is the Association of Professional Flight Attendants ("AFPA"). The AFPA is an association located at 1004 West Euless Boulevard, Euless, Texas 76040. AFPA conducts business in New York and represents flight attendants in New York as their union. AFPA is sued nominally because it lodged the grievance before the Adjustment Board and is listed as the filing party.

### Jurisdiction

4. Jurisdiction is conferred upon this Court pursuant to 28 USC 1331 and 45 USC 153(p) as this action seeks, primarily, to direct a carrier to comply with the Order of an adjustment board as defined by the Railway Labor Act.

### Background

5. In 2011, AA wrongfully terminated Rodgers' employment as a flight attendant for the airline despite over 20 years of service.

6. In addition, AA reported a defaulted debt to the major credit bureaus claiming Rodgers owed it for wages advanced but not earned.

7. A grievance was filed by the APFA on behalf of Rodgers with a System Board of Adjustment asserting wrongful termination and demanding back pay and all benefits accrued.

8. On December 23, 2013, the System Board of Adjustment

2

sustained the grievance.  A copy of the decision and determination is appended herewith as Exhibit A.

9. The System Board of Adjustment directed that "Having made the above determination that there was no just cause for the termination, the remedy is clear.  The grievant is therefore to be reinstated to his position as a flight attendant as soon as practicable.  His reinstatement is with back pay and all contractually accrued benefits from July 13, 2011 to the date of his reinstatement herein[...]. The arbitrator will retain jurisdiction to resolve any issues with regard to the remedy hereby ordered hereunder." *Id.*

10. AA paid the back pay ordered in mid-2014.

11. AA provided payment for 2013 profit sharing benefits on August 5, 2014.

12. However, AA never provided Rodgers with his share of company equity as required.

13. AA also failed to reinstate Rodgers to his proper seniority.

14. AA also failed to resolve the erroneous collection activity it reported despite written and oral disputes being made.  To date, AA continues to falsely report that Rodgers owes money to AA when the opposite has been true.

15. Rodgers has repeatedly attempted to resolve these issues by communicating with the APFA, AA, and filing two motions

facebook

Like Us On

7 KB
Image002.png

with the System Board of Adjustment.

16. While myriad promises were made to resolve the matters, over two years have passed since the award with no resolution.

## COUNT I — ENFORCEMENT OF AWARD PURSUANT TO 45 USC 153(p)

17. Paragraphs 1 through 16 are hereby incorporated by reference and are realleged as if fully set forth again.

18. AA did not comply with the order of the System Board of Adjustment in that: (1) AA failed to provide Rodgers his share of equity; (2) AA failed to readjust Rodgers' seniority accurately; and (3) AA continues to misreport that Rodgers owes it money for overpaid wages to national credit bureaus even though it is Rodgers who is owed money, not AA.

19. While the decision of the System Board of Adjustment provides that the arbitrator will maintain jurisdiction over all the administration of the award, Rodgers filed two motions with the arbitrator to resolve the issues. Because nominal respondent APFA did not join Rodgers' motions, and since Rodgers was not the party filing the case, it appears that the arbitrator will not respond to Rodgers' motions.

20. To the extent that this Court deems it appropriate for the System Board of Adjustment to rule on these issues, the Company did not comply with the decision in that it

4

did not submit the outstanding issues back to the System
Board of Adjustment despite it retaining jurisdiction,
effectively leaving Rodgers without a remedy.

21. Rodgers is entitled to enforcement of the decision of the
System Board of Review including his equity stake and
proper level of seniority.

22. Finally, Rodgers is entitled to prejudgment and post-
judgment interest on the award with interest paid to him
on the back pay (of $113,368.10, from July 13, 2011 until
March 18, 2014), the profit sharing payment (of
approximately $1,500 from 2011 until August 6, 2014), and
the unpaid equity stake (amounts unknown) until the
present.

WHEREFORE, Plaintiff Sammy Rodgers respectfully demands that this Court:  (1) Enter judgment based on the order of the Adjustment Board; (2) Issue a writ of mandamus to enforce the award and compel AA to provide Rodgers his equity stake; (3) Issue a writ of mandamus to enforce the award and compel AA to reinstate Rodgers to his proper seniority level based on his being a flight attendant since gaining employment with AA until the present time; (4) Enjoin AA to remove the references to the purported debt for overpaid wages from all major credit bureaus; (5) Award petitioner reasonable attorney fees pursuant to 45 USC 153(p); (6) Calculate and award prejudgment and post-judgment interest from July 13, 2011 until March 18, 2014 on the back pay of $113,368.10; (7) Calculate and award prejudgment and post-judgment interest from July 13, 2011, until August 5, 2014, for the profit sharing of $1,500, and from June 2014 until the present time for the still unpaid equity share; (8) Allow this action to proceed without costs in the district court pursuant to 45 USC 153(p); and (9) Any further relief that may be appropriate and just.

I, Sammy Rodgers, declare and state under the penalty for perjury that the foregoing is true and correct. 28 USC 1746.

Respectfully submitted,

Sammy Rodgers

6

## EXHIBIT A

## DECISION OF THE ADJUSTMENT BOARD

## IN RE ARBITRATION BETWEEN:

## ASSOCIATION OF PROFESSIONAL FLIGHT ATTENDANTS, APFA

**and**

## AMERICAN AIRLINES, Inc.

## DECISION AND AWARD OF SYSTEM BOARD OF ADJUSTMENT
### Case # SS-136-2010-JFK-22

**JEFFREY W. JACOBS, NEUTRAL PANEL MEMBER**

**GREGG FORMELLA, COMPANY BOARD MEMBER**
**MARK MOSCICKI, COMPANY BOARD MEMBER**
**MARCUS GLUTH, UNION BOARD MEMBER**
**SUZANNE EDWARDS, UNION BOARD MEMBER**

**December 23, 2013**

IN RE ARBITRATION BETWEEN:

APFA,

and

American Airlines, Inc.

DECISION AND AWARD OF ARBITRATOR
Sammy Rodgers grievance
Case # SS-136-2010-JFK-22

## APPEARANCES:

**FOR THE AIRLINE:**

Julie Hagen Showers, Attorney for the Company
Charlene Howell, Flight Service Manager
Rhonda Chernay, FMLA Service Representative

**FOR THE UNION:**

Mark Richard, Attorney for the Union
Sammy Rodgers, grievant
Randy Trautman, APFA Negotiator
Sammie Holmes, grievant's mother
Jessica Washington, APFA council Representative

## PRELIMINARY STATEMENT

The hearing in the above matter was held on August 13 and 14, 2013 at the Marriott Courtyard Hotel in East Elmhurst, NY. The parties presented oral and documentary evidence at which point the hearing record was closed. The parties submitted Post Hearing Briefs dated October 1, 2013.

## ISSUES PRESENTED

The parties stipulated to the issue as follows: Whether the termination of the grievant was for just cause? If not, what would be the remedy? (Tr. at page 7).

## CONTRACTUAL JURISDICTION

The parties are signatories to a collective bargaining agreement, CBA, providing for a System Board of Adjustment to hear and decide grievances related to the contract and discipline/discharge of covered employees. The parties stipulated that there were no procedural arbitrability issues and that the matter is properly before the Board.

## RELEVANT CONTRACTUAL PROVISIONS

Section 28 B 1 a

Notification of Discharge/Request for Investigation

Flight attendant shall not be discharged from the service of the Company without written notification of such action which shall contain the precise charges nor without an investigation and hearing thereon, provided that such Flight Attendant makes written request for such an investigation and hearing within ten (10) days, exclusive of Saturdays and Sundays, after receipt of notification. A copy of such discharge will be sent to the APFA Base Chairperson and the APFA Division Representative, simultaneously with employee notification, unless the employee being discharged requests otherwise.

Section 28 B 1 f

Withhold from service

A.   Flight Attendant may be held out of service by the Company pending such investigation, hearing and the appeals therefrom.

## RELEVANT RULES

## PEAK PERFORMANCE THROUGH COMMITMENT AND RULES OF CONDUCT

Peak Performance Though Commitment (PPC) provides a system that fosters communication and the ability for a manager and an employee to work as a team to correct performance in a fair and mature manner. It also establishes a system which allows the manager to provide positive reinforcement for employees who meet or exceed expectations.

Peak Performance Through Commitment does not preclude the termination of an employee who commits any act that in and of itself calls for immediate termination.

## EMPLOYEE RESPONSIBILITY

Your performance as an employee is a key factor in the overall success of American Airlines. You are expected to meet or exceed the performance standards of your position. As an employee, you are responsible for knowing the expectations of the job and how you are performing in the position.

The company wants you to succeed in your job and has a policy in place that supports your efforts -- Peak Performance Through Commitment (PPC). The policy is a system based on progressive corrective action that facilitates change in employees with problem performance or conduct.

Some actions in and of themselves call for immediate termination without progressing through the steps of the Peak Performance Through Commitment process. As a responsible employee, you should easily understand why these acts result in immediate termination.

Rules of Conduct: Rule 25, Rule 26, Rule 33, Rule, 34 Rule 37.

## SERIOUS INCIDENTS OR OFFENSE

Violations of AA <u>Rules of Conduct</u> # 25, 26, 33, 34 and 37 will result in immediate termination. For an explanation of these Rules of Conduct please refer to Employee Policy Guide (EPG).

## MUST THE PEAK PERFORMANCE PROCESS BE FOLLOWED WITHOUT EXCEPTION?

Ever situation is unique and therefore a manager must exercise judgment in dealing with a particular problem. The procedures outlined here are generally applicable, but the manager retains the authority and the responsibility for dealing with specific problems in specific ways dictated by the circumstances of the case. Deviations from these procedures, however, should be reviewed with HR Operations Support prior to taking any action.

## RULES OF CONDUCT

### RULE 16

Misrepresentation of facts or falsification of records is prohibited.

### RULE 34

Dishonesty of any kind in relations with the company, such as theft or pilferage of company property, the property of other employees or property of others entrusted to the company or misrepresentation in obtaining employee benefits or privileges, will be grounds for dismissal and, where the facts warrant, prosecution to the fullest extent of the law. Employees charged with a criminal offense, on or off duty, may immediately be withheld from service. Any action constituting a criminal offense, whether committed on or off duty, will be grounds of dismissal.

## PARTIES' POSITIONS

**COMPANY'S POSITION:**

The company's position is that there was just cause to terminate the grievant. In support of this the company made the following contentions:

1.      The company asserted that the grievant violated Rules 16 and 34 set forth above when he claimed sick leave for his scheduled trips on November 26 and December 24, 2009. The company further asserted that these dates are significant in that they fall immediately before major US holidays and are difficult to "trade," as discussed below. Therefore the grievant had an incentive to lie about being ill in order to avoid any responsibility for these trips.

4

2.      The company noted that his ruse was successful and that his absence in November 2009 was cleared and that he was returned to active status as far as the company knew. The company asserted further that the grievant (or someone acting at his behest) continued to trade trips but found it difficult to trade the trip for December 24, 2009, as one might imagine. The company asserted that he called in again to report that he was ill but that this time he failed to get the absence cleared.

3.      In fact, the company asserted, these trips were not traded and the grievant remained responsible for them until someone identifying himself as the grievant with the grievant's password and employee ID number, contacted the company to report that he was ill and could not fly on November 26 and 27, 2009. The company noted too that the practice of giving out one's employee ID number and password is against company policy and is not knowingly condoned or ignored as the union contended. The company argued that it is thus far more likely that the grievant, despite his incarceration, made this call in order to drop the trip and avoid any liability for it. The company asserted that this was clear fraud and dishonesty in direct violation of Rules 16 and 34.

4.      The company also noted that the grievant had already accumulated enough attendance points that his manager, Ms. Howell, had previously sent him messages to discuss these problems and to get him to improve his attendance.

5.      The company noted, and indeed there is no dispute, that the grievant was incarcerated in Lima, Peru during the times he called in to report he was sick and could not come to work. The company took issue with the grievant's asserting at the arbitration hearing that he was in Peru for medical treatment and questioned why he could not have simply gotten medical treatment through his company insurance in the United States. The company further asserted, albeit somewhat obliquely that his claim for medical treatment was a subterfuge for other reasons that he was in Peru. The grievant did not contend he was actually sick on the days of the missed trips in November and December 2009.

6.      The company also made much of the fact that he did not inform the company of his arrest or his subsequent long-term incarceration while in Peru. The company noted that even though the grievant claimed to have limited access to phones or computers to get messages out from jail, he did so to his mother and to the company when it suited him yet he claimed that he was "unable" to make a phone call to his supervisor to deal with his attendance issues or to report the incarceration.

7.      The company noted too that instead of advising the company of the arrest as he should have, he arranged for friends and a so-called trip trading service to manipulate his schedule and trade trips to cover his schedule. The company also asserted that the grievant had not flown for several months even prior to his arrest and raised questions about his true commitment to the company in any event since he was so lax in actually working there.

8.      The company also pointed out that his arrest was for alleged criminal sexual misconduct. The company also referred to the grievant's e-mail address and a website that he created or at least helped to create that was quite pornographic in nature showing various homosexual acts with mostly Latin American young men and boys. The company asserted that it was at least likely that the grievant was not in Peru for medical treatment at all but rather for the purpose of making the movies for the website. The company further assailed the grievant's credibility on this basis and, as will be discussed more below, what the company called gross inconsistencies in his testimony.

9.      Company exhibit 3 showed the attendance policy applicable to flight attendants. . The grievant had accumulated 7 points under the policy, which calls for a pre-termination warning. The company asserted that the grievant was thus in some difficulty with his attendance points and needed to correct this or face further discipline, including discharge, for the attendance issue alone.

10.    The company's main witness was Ms. Howell, who testified that she had no idea the grievant was in jail until she spoke with the grievant's mother in late January 2010. What she knew was that the grievant's attendance points were at a dangerous level and she sent him a letter dated December 10, 2009 by FedEx to his New York address advising him of the need to discuss this with her as soon as possible. Significantly someone named "Hernandez" signed for this letter.

11.    Ms. Howell also tried reaching the grievant on his cell phone but was unable to. The company noted too that flight attendants are required to maintain a working phone number in case the company needs to contact them - sometimes for this very contingency.

12.    Ms. Howell testified that she discovered in January 2010 that the grievant had not responded to the letter, had not been to a required training session and that his US passport had expired. She tried again to reach him but was unable to get through on his cell phone.

13.    The company and its witness claimed that she then tried to reach the grievant's emergency number multiple times but either got a busy signal or the call was unanswered. Ms. Howell asserted that she did finally get a call back from the grievant's mother on January 26, 2010 and that it was only then that Ms. Howell was aware that the grievant was in jail in Peru. She immediately reported that fact to corporate security and human resources.

14.    The company then pointed out that only two days after the fateful call to the grievant's mother a very suspicious and telling chain of events transpired that it argued showed that the grievant knew his attendance points needed to be fixed and demonstrated a clear attempt to cover the lies he had perpetrated on the company only weeks before by claiming he was sick when he really wasn't. On January 28, 2010 the grievant, or someone claiming to be him – again identifying themselves as the grievant with his identifying information - called the Flight Attendant Service Center, FASC, to inquire about FMLA leave and asked whether FMLA leave could be used for legal reasons. He was advised that it could not be and that FMLA was for illness and medical related issues only, unless it was for an adoption or placement of a foster child.

15.    Despite the grievant's claim that he did not place the first call that day he admits making another call on that same day asking that an absence he had in October 2009 be recoded as FMLA or that it be covered by his vacation days.  The company argued that this shows that he clearly knew about the attendance issues – somehow someone must have advised him of that and that he was now scrambling to cover his tracks in order to avoid both the attendance point problems and to avoid detection of the fraudulent sick calls made in November and December.

16.    There was yet another call on that same day made only minutes after the second call asking that the November absences be recoded to FMLA.  That person also identified themselves as the grievant.  The company argued that these calls were documented per policy and that the series of events here showed not only that the calls were made but also that the grievant made them.  These can only be a back door attempt to cover the prior absences in what the company called a tangled web of lies that was clearly unraveling.

17.    The company also noted that the grievant again called his supervisor on February 3, 2010 and left her a voicemail message – which she identified as truly the grievant this time due to his voice.  He simply said he would "call her back" but did not disclose the arrest or his circumstances in Peru.  The company at the same time asserted that the grievant's claim that he was unable to gain access to phones or a computer was unbelievable and unsupported by the clear fact that he made several calls, had an internet blog that he started while in prison and time enough to send messages to the US, public officials and even Oprah Winfrey in an attempt to free himself and must have had some time and opportunity to advise the company of his whereabouts.  Not surprisingly, there was no return call made and no way for Ms. Howell to reach him at that point.

18.    While all this was going on, Ms. Howell was left in the dark until the call with the grievant's mother.  She engaged a law firm to try to find the grievant in Peru.  This was above and beyond her or the company's obligation since there was no evidence that the arrest had anything to do with his duties as a flight attendant – she was simply trying to find him.

8

19.   The company also determined that the grievant did not have sufficient vacation time to cover the absences in October or November and so took them back. Even though the grievant claimed he had no way to contact the company and was unaware of what was going on with his attendance points or how his absences were coded, someone claiming to be the grievant again called the FASC to inquire about recoding the vacation time and about the conversion of his absences to FMLA. The company queried how this could have been done if the grievant was unaware of it – and asserted that the grievant knew all along what was going on but was intentionally avoiding contact with the company and continuing to lie about the illnesses.

20.   After Ms. Howell finally determined where the grievant was and the underlying circumstances of his arrest she put all the pieces together and determined that the grievant had violated rules 16 and 34 and had been dishonest with the company about his illness and that he fraudulently claimed FMLA and sick time when he was not sick.

21.   The company asserted that the grievant failed to advise the company of his incarceration, failed to be honest with Ms. Howell and that he could have contacted the company to let them know his situation but failed to do so in an obvious attempt to hide it.

22.   The company asserted too that Rule 34 creates an affirmative duty to disclose any incarceration so that the flight attendant can be withheld from service. This both allows the company to cover the absence and to monitor the case to determine if it needs to intervene and deal with any criminal activity that may impact the employment relationship.

23.   The company's claim is predicated on the claim that the grievant in fact made the calls and that he did so fraudulently knowing that he was not sick and that these days were not covered by FMLA leave in any way.

24.     The company cited a great many prior arbitrations both involving the company and others that stand for the proposition that theft and dishonesty are grounds for immediate termination irrespective of the length of service or prior work record of the grievant involved. The company also cited cases for the proposition that a grievant whose job is on the line may well be fabricating all or part of the story in order to save their job and that in a credibility case such as thus, the arbitrator should err on the side of assuming that the grievant with such an incentive may well be lying or omitting significant parts of the story. See, *Pacific Rim Transport and Teamsters Local 692*, 104 LA 203, 208 (Prayzich 1995) (citing Sinicropi and Hill, *Evidence in Arbitration*, 2nd Ed. (1990). See also, *Comair and ALPA*, CMR 96-152-45 (Fishgold 1997) (where the arbitrator found that the other witnesses in the case had no incentive or motive to lie and that the grievant did and therefore disbelieved the grievant).

25.     In *Northwest Airlines and ALPA*, 94 AAR 0013 (Tsukiyama 1993) the arbitrator determined that dishonesty is "invariably ranked among the most serious and heavy of industrial sins." Slip op at 11-12. The arbitrator also cited Elkouri and Elkouri, *How Arbitration works*, BNA 4th Ed and noted that "dishonesty ... once proven may be subject to summary discharge even upon a first offense or without the necessity of prior warnings or discipline." Elkouri at 671.

26.     In *IAM and US Airways*, 100 AAR 0133, (Zumas 1998) the arbitrator again denied a grievance where the grievant was found to have stolen batteries from the employer. He too observed that once trust is lost the relationship becomes so "tainted that the employer has the prerogative of severing that employee." Slip op at page 10. The company argued that the grievant simply cannot be trusted now and that his intentional lies have severely undermined any faith the company had in him despite his many years with the company.

27.    The company cited with particular emphasis *Northwest Airlines and IAMAW #143*, COFPS 93-34 (Eischen 1994).   There the arbitrator upheld discharge where the grievant had fraudulently obtained airline tickets and noted that the "false ring of such testimony, however becomes apparent when it is dissected carefully and subjected to the acid test or reason and consistency.") The company asserted that the grievant's testimony falls apart when subjected to this analysis.

28.    The company also cited *American Airlines and Transport Workers # 538, # M-1220-95* (Sinicropi 1996).   There the venerable arbitrator Tony Sinicropi upheld the discharge of an employee who stole cargo from a plane and where a video showed him doing it.   He found that the grievant "lied and was deceitful and thus is also guilty of a Rule 16 violation."   Even though a discharge for a Rule 6 violation was "not mandatory" the arbitrator sustained the discharge given the multiple violations and the severity of the theft.

29.    In *IBT 2000 and Northwest Airlines*, 95 AAR 0196 (LaRocco 1995) the arbitrator upheld the terminations of two flight attendant for falsifying sick leave records and for calling in sick when they were not.   The company argued that this case is thus quite similar and that the arbitrator ruled that "dishonesty is a serious offense warranting a severe penalty.   If grievants were returned to service, the company would never know when grievants were telling the truth and when they were telling lies.   The company rightly depends on flight attendants to be trustworthy and honest.   The company persuasively argued that it cannot entrust its passengers or its money to dishonest flight attendants. "Slip op at pages 23-24.

30.    In *Atlantic Southeast and Assoc. of Flight Attendants*, 72-60-01-07-98 (Fishgold 1999) the arbitrator upheld a discharge where a flight attendant who falsified time records and failed to show up for work despite not being ill.   The arbitrator rejected the claims that the discrepancies were minor, that the grievant should have been given progressive discipline and that the grievant somehow misunderstood the time reporting requirements.   Slip op at 14-15.   The company argued that these same sorts of arguments are being made here and should be similarly rejected.

11

31.     The company argued that the grievant's lies did not stop merely with his failure to report his incarceration and calling in sick but extended to falsely claiming his absences were covered by FMLA. The company pointed to what it termed highly suspicious calls made to the FASC inquiring about whether FMLA may be used for legal reasons. Having been told they were not, the person identifying themselves as the grievant called back minutes later and claimed that his absences on November 26 and December 24, 2009 were related to the grievant's FMLA absences.

32.     The company asserted that the grievant's vain attempt to blame a third party cannot be believed and should be rejected. The company argued that while it may be commonplace for flight attendants to give out their personal identification information to trip traders in order to trade or drop trips, the flight attendant is ultimately responsible for the scheduled trips. The company noted too that he remained responsible for the trips for which he claimed sick leave. The company argued that the grievant assumed the risk that when he left the country some trips would not be traded and that he must be held responsible for those trips, whether he made the calls in question or not.

33.     The company asserted that the grievant's case is based on preposterous assumptions and that for his story to be believed several outlandish scenarios would have to be true. Someone with knowledge of the grievant's situation would have had to call the grievant in sick using his ID information; someone would have had to impersonate him again only days after Ms. Howell spoke to the grievant's mother; someone would have had to know the grievant's FMLA balance and personal situation at the time of the call; that same person, presumably without being able to contact the grievant, would have had to call in both immediately before and after the grievant himself placed a call on January 28, 2010 to request that the company handle the grievant's absences in November and October in the same manner as the grievant had only a few moments before. The company asserted that these things are not plausible and that the grievant must have placed all those calls in an effort to cover the fraudulent calls in November and December.

34.    The company took issue with the grievant's other claim that his absences really were related to his FMLA approved leave.  The company asserted that the treatment he claimed he went to Peru to get could easily have been obtained in the USA and that the real reason he was in Peru for was other, less valid reasons – i.e. to make movies of a pornographic nature.  While this may not be the reason for his discharge, the company asserted that it demonstrates the grievant's propensity to lie about material facts.

35.    The company also countered the claim that the grievant had no reason to lie about being in jail because he had been incarcerated in the Dominican Republic several years before this incident and spent months in jail.  The company argued that when reviewing messages the grievant sent out while in jail at that time he admitted that he was "in danger of losing his job."  Thus, the company argued he was clearly aware that being in jail could result in the loss of his job.

36.    The company pointed to other issues involving the grievant's credibility and argued that he has a history of making inaccurate and even false statements to the company  At one point he made a request for FMLA to attend to a person he claimed was his "mother."  However upon examination it was determined that it was for his grandmother.  The company asserted that the latest incident is nothing more than continuation of a pattern of misrepresentations the grievant has engaged in over the course of several years.

37.    The company countered the union's claim that there were due process violations in this case and argued that the grievant received ample due process, including a full and fair evidentiary hearing before this Board.  See *Kaiser, Steel and USW*, 78 LA 185, 187 (Leonard 1982).  He was not prejudiced in any way due to the investigation that was performed and had ample opportunity to present his side of the story at any time during the nearly 3½ years this procedure has been pending.

38.    The company asserted too that even if there were some deficiencies in the investigation those were either minor so as to constitute harmless error or were not material.  Further, many arbitrators look past claims that there were inadequacies in investigations in the face of compelling facts establishing the grievant's guilt.  See, e.g. *Kaiser Steel and USW*, 78 LA 185 (Leonard 1982) *Cameron Iron Works and IAMAW* 73 LA 878 (Marlatt 1979).  Here too, the company had to conduct an investigation with the facts it had at the time.  At the time it was unable to contact the grievant due to his incarceration.  The company's investigation consisted of what it knew from the conversations Ms. Howell had with the grievant and his mother, the evidence that someone with the grievant's personal information and his situation made several calls to the company for the purpose of avoiding liability for missed trips.  Its investigation was therefore both accurate and adequate.

39.    The company was not compelled to wait for years before deciding what to do with the grievant.  In May 2010 it had no way of knowing, or if, the grievant would ever be released from jail.

40.    The company also asserted that the grievant has never informed the company that he did not make the calls in question until the arbitration hearing.  The union should not now be heard to complain about the "lack" of investigation when it clearly knew what the charges were and yet never refuted them until the hearing.

41.    The company asserted that it must have absolute faith in the honesty and integrity of their employees.  They hold people's lives in their hands and have a duty to be honest and forthright about everything they do.  They deal with property and the health and safety of the travelling public.  To have a person whose honesty is in question cannot be tolerated in this or any industry.

42.    The company further asserted that despite his length of service, having been hired in 1989, Tr. at 59, 21-25, this violation was so serious and his dishonesty so severe that it warrants immediate termination.

The company seeks an award denying the grievance on the merits in its entirety.

## UNION'S POSITION

The union's position was that the there was not just cause for the termination in this matter. In support of this position the union made the following contentions:

1.      The union asserted that the grievant is a long-term employee with 20 years' service to the company. The union further asserted that there is no dispute that he left for Lima Peru to get medical treatment for what the grievant testified was a hematoma condition in his leg.

2.      The union further asserted that he told his friend, now deceased, to drop his trips so he could spend time in Peru. The union noted as well that there is no question that he had the right to do this and that flight attendants drop and trade trips all the time and that there is no rule against it.

3.      The union also noted that the grievant used a trip trading service to facilitate dropping or trading his tips. He gave out his personal identification information the at service to aid them in doing this. The union acknowledged that the company "frowns" on this practice and discourages people from giving out their personal passcodes, information to trip traders but asserted that the company does not prohibit it and is well aware that flight attendants frequently give out this information to one or even several trip traders. The union acknowledged that even though the flight attendant remains responsible for scheduled trips, missing a trip does not result in an accusation of fraud – which is the basis of the grievant's termination.

4.      Mr. Trautman explained how trip traders work and how they are paid. He also explained that if they cannot drop a trip they could claim that the flight attendant was ill by using the passcode and calling in to report their illness without the flight attendant knowing it. He also noted that dropping trips around major US holidays is frequently difficult due to high demand for that time off by flight attendants. The union maintained that the calls to the company might well have been placed by such a trip trader and that there was no hard evidence at all that the grievant placed these calls to report that he was sick in November and December 2009.

5.      The union and the grievant outlined his ordeal while in Peru starting in early November 2009 when he was wrongly accused of rape by a 27-year-old man. The grievant explained his arrest as what he said was an attempt by police to extort money from him even though the charges were completely unfounded and his subsequent refusal to submit to this bribery scheme. Police confiscated his wallet, his cell phone and his passport making contact with anyone almost impossible. Many times the phones would not work, would cut out or were taken from him even though he had to engage in terribly humiliating behavior to gain access to one.

6.      He was first incarcerated at Huaral prison and later in Luringancho prison, which the union argued is one of the worst prisons in the world. He explained that he had little access to cell phones or computers and to get them he had to engage in unspeakable acts with other prisoners. Life was cruel and sparse and the circumstances of his incarceration were nothing like what he might have faced in a US jail. Medical care was almost non-existent and even food and water was difficult to get.

7.      Further, since he was accused of sexual misconduct, it was even harder for him to survive in prison. He was assaulted ridiculed and ostracized by the other inmates and guards and had to watch is back virtually constantly to keep from being beaten, raped or killed. The union asserted that dealing with attendance points, making contact with the employer or his supervisor was by no means a priority for him and that he had little or no information about his status with the employer given the difficulty of getting messages in and out of prison.

8.      The union acknowledged that in late November 2009, the day before Thanksgiving and during the time of the grievant's incarceration and when he could not make or receive regular calls or e-mails, someone made a call to crew scheduling to report that the grievant was sick. A similar call was apparently made the day before Christmas but the company has no hard evidence of who made those calls. The union argued most ardently that the company has not and cannot meet its burden of proof that the grievant made these calls and asserted too that it is just as likely, perhaps even more likely, that a trip trader made the calls due to the difficulty of trading those trips on those specific days.

9.     The union further argued that the grievant had been incarcerated in the Dominican Republic in 2005 and 2006 and was placed in a withheld status at that time and, significantly, did not accumulate any attendance points. He thus felt that being away from service for legal reasons did not trigger attendance points under the employer's policy and thus had no motive to fabricate the reason why he was not available for service during his jail time in Peru.

10.     The union acknowledged that the missed trip on November 26, 2009 triggered an attendance point due to the missed trip. His supervisor, Ms. Howell sent the grievant a letter regarding his accumulated points. The union noted that this letter was sent to his New York address and that he was in jail and did not get the letter. The union also noted that despite the admonition that the grievant needed to contact Ms. Howell within ten days, there was no effort to even try to reach him by phone until late January 2010 and he was not fired until May 2010 even though the company never talked to the grievant or advised him of the allegations that he falsified sick calls in November and December.

11.     The union argued that eventually Ms. Howell made contact with the grievant's mother in late January 2010 and was informed that he was in jail. She even acknowledged that she had been informed during that call of the grievant's incarceration. Tr. at 71-72. The union asserted that she should have placed him on withheld status, just as the company had done when he was incarcerated in the Dominican Republic in 2005 and 2006. She failed to do so and instead simply assumed that he had made the sick calls on the days in November and December without even talking to the grievant. The union asserted most vehemently that assumptions without evidence cannot be the basis for just cause.

12.     The union also noted that in fact the grievant's mother had two conversations with the company; the first with Ms. Howell in which she informed her of the grievant's incarceration, Tr. 240-241, and the second in which both Ms. Howell and a Mr. Bello were on the line with her. Tr. at 242, (The company stipulated that Mr. Bello from corporate security was on the line during that second call.)

13.     Even though they again discussed the grievant's attendance points the grievant's mother again told them that he was in jail. There was no mention of fraud or sick calls and the grievant's mother testified that Ms. Howell indicated she would send paperwork to take care of the attendance issue but never followed through on that promise.

14.     The grievant contended that he was able to get in touch with his mother who informed him of the attendance point problem. Difficult as it was to get access to a phone, he contacted the company and tried to get the absences prior to his incarceration recoded as FMLA, citing the medical issue he had originally gone to Peru for in the first place. That of course would have dropped his attendance point issue down. Both the union and the grievant reiterated that he attempted only to get the absences *before* his arrest recoded; first because he had no knowledge that the company would later allege he had made fraudulent calls to report himself sick and second because he knew that recoding the prior absences to FMLA would result in dropping the attendance points. Further, he was aware that the incarceration had been reported to the company through his mother – twice – and that he assumed he would be placed on withheld status as he had been before. Thus he did not need to report his incarceration because his mother already had. Tr. at 317-318. There was also clear evidence of the grievant's incarceration, even though there was nothing to suggest that his mother had been wrong about it, from a Peruvian law firm hired by the company to find the grievant. It was clear that the company knew he was in jail well before they terminated him.

15.     The union further asserted that there was in fact a resolution of the points issue with the union business representative, Ms. Jackson. She testified that she spoke with Ms. Howell and that the attendance points were appropriately recoded. There was also no mention of abuse of sick leave or fraud or any of the matters that later appeared in the discharge notice. Tr. 269-270.

16.     The union asserted most vehemently that there was a woefully inadequate, even non-existent, investigation by the company.  Ms. Howell assumed things that were not shown by the evidence, assumed that the grievant made the sick calls when there was no evidence of it, and knew that he was in jail by at least January 2010 and, most significantly never talked to the grievant himself before deciding to discharge him.  The union asserted that this crucial error was a lynchpin of their case and that without even talking to the grievant or even clearly advising him that there were suspicions of fraudulent use of sick leave there is no just cause as that term is defined by longstanding arbitral precedent.  The sole contact in person was by a corporate security person sent to serve the grievant with the letter of termination.  The union asserted nothing more was ever done to verify or even hear his story.

17.     The union too cited numerous cases regarding the standards for establishing just cause and asserted that discharge carries with it such a huge economic and social stigma that it should never be sustained unless there is clear and compelling evidence of guilt.  Assumptions, speculation and conjecture are never enough.

18.     In *American Airlines and APFA*, case # SS-137-2009-IMA-35 (Peace 2011), the arbitrator overturned a discharge with full back pay and benefits where there was an allegation of an inappropriate insult used by the grievant toward other employees.  There the company rushed to judgment based on an inadequate investigation and the union asserted that this case is similar in that regard.

19.     In *American Airlines and APFA*, SS-91-2008-ORD-19 (Margaret Brogan 2010) the flight attendant was accused of stealing a customer's bag.  The arbitrator ruled that there was insufficient evidence of theft and that the flight attendant in fact put the bag in safe keeping so it could be returned to the customer who lost it and that there was insufficient evidence of theft.  The union argued that the arbitrator there relied on the lack of an adequate investigation and determined that the company had made certain invalid assumptions about the flight attendant's intentions.

20.     Similarly in *American Airlines and APFA*, SS-0088-1003-LAX-010 (Gaunt 1995) the grievant was reinstated with partial back pay where it was found that her husband, unbeknownst to the grievant, had engaged in a scheme to defraud other flight attendants. The company had assumed that the grievant knew about the scheme but the evidence in that case showed that she did not. The grievant had signed certain documents that implied her complicity in a fraud scheme but a thorough investigation showed that the husband conned the flight attendant too and that it was only her love and trust that caused her to be somewhat blinded to the real facts. Here too the company is making assumptions based on only part of the story.

21.     In *American Airlines and APFA*, SS-40-2002-SFO-003 (Winograd 2003) the arbitrator reinstated a flight attendant without back pay even though there was evidence of inappropriate and fraudulent use of a ticket for a friend. The arbitrator found that the company's investigation was lacking and that there was thus inadequate evidence of theft as alleged by the company.

22.     Further, the cases cited by the company were all cases where the grievants were either caught by very convincing evidence or where they admitted their misconduct and argued for reinstatement on other grounds. Here the grievant flatly and consistently denied ever making the calls to report himself sick nor did he ever ask anyone to report him sick. Any others were simply to get his absences prior to his incarceration recoded to deal with the attendance point issue he was apprised of months afterward. For all he knew by the end of November the trips had been traded by the trip trading service.

23.     The grievant has never wavered from his version of events and the union noted that his first real chance to tell his story was at the hearing – not before – so the company's claim that the grievant somehow 'waited' to tell his story is groundless. That he did not immediately assert his innocence regarding the calls is explained by the clear fact that the company never told him they were making that allegation against him until the day he was fired in May 2010. He was at that point of course still in jail and was not released until July of 2011.

20

24.     The union pointed to this as clear evidence of a very poor investigation and one that simply started with the conclusion of guilt and worked backwards from there. See tr. at 116-117, where Ms. Howell admits she fired the grievant before ever talking to him or giving him a chance to tell her his side of the story and that the termination letter was sent before she even knew where he was. The union argued that this falls far short of just cause to fire a 20-year employee.

25.     The union also cited cases for the proposition that the standard proof in a case of this nature where there is an allegation of fraud requires clear and convincing evidence, not merely a preponderance of the evidence. The union asserted that there is not even a preponderance of the evidence here since the company failed to conduct any investigation beyond making assumptions based on only its side of the case.

26.     The union countered the claim by the company that the grievant's story is full of inconsistencies and argued that it in fact fits together perfectly if one looks at the entire story. The grievant did not need to fabricate a story about being sick since he was in jail and would have been carried on withhold status. He did not advise Ms. Howell of his situation because he knew by the time he was able to reach her that his mother had already told her that. It is further not only plausible but more than likely that if indeed calls were placed to the FASC to report the grievant off sick that it was a trip trader that did that in order to drop the trips they could not trade, given the dates in this case and that the company's main witness had to admit on cross examination that this was indeed a very real possibility. See Tr. at 129-130.

27.     The union also asserted that the basis of the termination was that the grievant was guilty of "fraudulent use of the sick leave policy" and "dishonesty." The union argued that there is absolutely no evidence of any dishonesty and in fact no motive for that. There was not even any hard evidence of the alleged calls themselves made to call the grievant in sick. The union asserted that the company is simply making bald assertions without adequate actual evidence to support it.

28.     The union also took issue with the evidence regarding the calls to ask if FMLA could be used for legal reasons. The union asserted that the grievant had no motive to ask that question since he knew that and since he had been placed on withhold during his incarceration years earlier.

29.     The union also took issue with the inconsistency of the company's own documentation and noted that some documents show a call in to report sick and others show that he was placed on FMLA for November 26th. Still others show no indication of a sick call in November 2009 yet other records show him on the sick list. Others still show him dropping trips for these same dates yet that is not possible if someone is on the sick list.

30.     The union also maintained that there were many inconsistencies in Ms. Howell's testimony and inconsistencies between hers and others and with documents in the case and that she was not credible. Her testimony regarding the call with Mr. Bello on the line was simply not believable. She alleged that the grievant's mother called her but that could not be the case since Mr. Bello was already on the line when the call started. These seemingly small details in the union's mind belied a deeper problem regarding what Ms. Howell recalled and what she was making up on the fly. Further, she never refuted the testimony of the union business representative who testified that he spoke with Ms. Howell about the grievant's absences and got them recoded to drop his attendance points such that there was no real problem with those by the winter of 2010.

31.     The essence of the union's case is that there was no proof whatsoever of the allegations of dishonesty or fraudulent use of sick leave. In fact the company was not even able to demonstrate the exact date the sick calls were made. Further, the investigation done here was woefully inadequate and failed to even get the grievant's side of the story. These basic deficiencies compel the conclusion that there was no just cause by any measure.

The union requests that the arbitrator sustain the grievance and order that the grievant be reinstated as of July 13, 2011 (the date the grievant was finally released from jail in Peru) with back pay from that date and with all contractual benefits.

## DISCUSSION

### FACTUAL BACKGROUND:

The record in this matter was extensive.  The matter was tried over the course of two full days of hearing resulting in more than 400 pages of transcribed testimony.  In addition, the parties submitted both post hearing briefs, both with extensive attachments in support of their respective positions in this matter.  The factual background will describe those facts that were clear on the record many of which were not disputed.  Other facts will be discussed as part of the analysis of the case.

The grievant is a 20-year flight attendant with American Airlines.  There was no evidence regarding his performance as a flight attendant; this case involves off duty actions and the allegations of violations of Rule 16 and 34.

The grievant travelled to Lima Peru for the purpose of obtaining medical care there.  There was little evidence as to why he went to Peru to get this treatment or why he could not have gotten it in the United States but the record was clear that he went there ostensibly for that purpose.

The grievant was arrested on charges of criminal sexual assault while in Peru on November 5, 2009.  Police confiscated his wallet, cell phone and US Passport at that time.  There was also ample evidence that the police asked the grievant for a bribe of $1,000.00 and they would let him go.  When the grievant refused to pay this he was incarcerated.  He was first taken to Huaral jail in Peru where he was detained without easy access to phones, computers or any way to communicate with the outside world.  As will be discussed below, the grievant gave graphic testimony of the conditions in Peruvian jails.  According to his testimony, they are quite different from those found in the US and the laws and expectations of due process and other protections common here are frankly just not found in Peru.  The evidence was also quite clear that in order to get access to phones or other devices to communicate required humiliating and dangerous acts too graphic to be described in detail here.  Suffice it to say that the ability to communicate was irregular and unpredictable at best and required sometimes inhumane acts to do so.

Prior to his trip to Peru the record showed that he asked a friend to drop his trips with the employer so he could stay in Peru on an extended basis. The friend had passed away prior to the hearing of this matter and there were no statements or recorded depositions from him on this record. The evidence also showed that the grievant engaged the services of several so-called trip traders to trade or drop his trips with the employer.[1]

There was considerable testimony about how these trip traders operate. They are common in the airline industry and their use is well known to both flight attendants and the company alike. The evidence also showed that while it is not encouraged, it is common for flight attendants to give out their personal passwords to these services to facilitate trading trips.

The evidence showed that the grievant gave out his passwords to trip traders so they could more easily drop trips. It was also shown that while this practice is directly contrary to company policy, the company is aware of it and has rarely if ever taken action to stop it or to discipline employees for doing it, although flight attendants are told they do so at their risk. Further, while the flight attendant remains responsible for the trip if the trader is unable to drop it, the evidence on this record showed that in that event the flight attendant may well be held responsible for that trip in terms of attendance points but is not generally charged with dishonesty under Rule 16 or 34.

Further, significantly, the trip traders, as a practical matter, have an ability to use the flight attendant's passwords to trade trips and can, if the situation arises, report them sick if they were not able to drop or trade a trip. Mr. Trautman, who testified on behalf of the union, gave credible testimony as to how this process works, Tr. at 204-217. Further, there was no evidence that giving out passwords to a trip trader even if that trip trader were to call a flight attendant in sick without that flight attendant's knowledge or consent, constitutes dishonesty by the flight attendant under rule 16 or 34.

---

[1] None of the trip traders were called to testify and there was little evidence as to their activity other than the records submitted to show that the grievant's trips were dropped – with the exception of the two under scrutiny here on November 26 and December 24, 2009.

Moving back to the grievant's specific situation, it was clear that he remained in jail in Peru as described above for many months.  Significantly, he was in jail without easy access to phones or computers throughout the months of November and December 2009.

There as evidence that someone called in to the company using the grievant's password to report that the grievant was sick on November 26 and again on December 24, 2009.  These dates are important because they fall immediately before major US holidays and the evidence showed that it is difficult to trade trips on these dates because so many flight attendants want them off.

The grievant flatly denied ever making the calls to report in sick and stated that he could not make them due to his circumstances in Peru.  There was no direct evidence that the grievant made these calls.  The evidence was also somewhat less than clear as to even exactly when those calls were made, see Tr. at 216.  It was clear that the grievant did not appear for work on either of those days for obvious reasons.

The company has an attendance policy that assigns points to absences.  When a flight attendant has accumulated enough points, they may be disciplined.  The company policy is when a flight attendant has accumulated seven points under this system they are sent a Pre-Termination Warning. See company exhibit 3 and Tr. at 60-62.

Ms. Charlene Howell, the grievant's manager testified that she became aware of the November 2009 absence described above and that the grievant was at seven points.  She sent him the required Pre-termination Warning via FedEx on December 10, 2009 to the grievant's New York City address. The evidence showed that this letter was delivered and that someone at that address signed for it.

The evidence was equally clear that the grievant had no knowledge of any of this at that point and did not receive a copy of that letter at the time.  The grievant testified credibly that at that time he was unaware of his situation with attendance points or of the call made to report him sick on November 26, 2009.

Ms. Howell left on a vacation and returned to work in early January 2010. She also discovered that the grievant had not attended a required training session and that his passport had expired. She discovered that there had been no response to the letter she sent to the grievant and tried multiple times to reach the grievant but was unable to. This was likely due to the fact that the phone had been confiscated by Peruvian police. It was not made clear at the hearing where that phone was at that time or whether it was even operable.

The evidence further showed that someone again called in to report that the grievant was ill on December 24, 2009. Again there was no direct evidence that the grievant made this call or precisely when the call was made and he flatly again denied making that call as well. There was evidence to show that trip trading activity occurred on the grievant's schedule throughout December 2009 up until the 24th. This was consistent with the evidence discussed above that a trip trader, or traders, had been engaged to do exactly that and further is consistent with the grievant's testimony that he had requested that his trips be traded. It is further consistent with the notion as put forth by the union that the grievant did not make the sick calls that formed the basis of the company's case here, since there was ample opportunity and incentive for the trip traders to do that. As discussed more below, there was little or no motivation for the grievant to do so. Thus the mere fact that there was trip trading activity going on in November and December does little to bolster the company's case on this record.

Ms. Howell was unaware of the grievant's circumstances at this point and testified that she had no way of knowing that he was in jail. All she knew was that someone had called him in sick, that his attendance points were at a critical level and that she could not reach him. She then called the grievant's emergency contact number and eventually reached the grievant's mother.

There was some dispute about when this call was made or who placed it. On this record the resolution of that issue was not crucial to the determination of this case. What was clear was that Ms. Howell spoke with the grievant's mother on at least two occasions and that at least as early as January 26, 2010[2] the company was aware that the grievant was in jail in Peru. Tr. at 71-73. There was a second call during which a Mr. Bello, from the company's corporate security service was also on the line. Again it was not completely clear whether the January 26, 2010 call was the first such call or the second call. It was clear that the second call, during which Mr. Bello was on the line, had been placed from the company to the grievant's mother. What is important here is that by January 26, 2010 at the latest, the company was aware that the grievant was incarcerated in Peru.

There was also evidence that during the calls between Ms. Howell and the grievant's mother there was discussion about the grievant's attendance points but no discussion of the allegations that the grievant had fraudulently called in sick on either of the two occasion under consideration in this matter. In neither of the calls between the company and the grievant's mother was there a discussion of that allegation and thus no way for the grievant to know that he was facing those charges.

The company did attempt to locate the grievant and discover his situation. They used local flight services in Peru and used corporate security to try to find him to no avail. Finally the company retained a Peruvian law firm to locate the grievant and discovered through them that the grievant was in prison in Huaral but found little else. It was thus clear that the grievant was in jail and that beyond even what the grievant's mother told them it was now verified by a law firm retained to discover that very fact.

---

[2] The overall record here shows that the first call was made on January 26, 2010 and not earlier as the grievant's mother thought. Several years have passed between that call and the date of the hearing, such that the discrepancy in memory of the exact date here is understandable but immaterial on this record. The company asserted that the grievant's mothers memory cannot thus be trusted but there was ample corroborative evidence that indeed the calls were made, the conversations focused on attendance points at first but that the company was made well aware of the grievant's situation during these calls.

Two days after the January 26th phone call there were a series of phone calls made to the FASC office by someone claiming to be the grievant. The first caller asked if FMLA could be used for legal reasons. This call was documented and the person answering the call for the company indicated that FMLA could not be used for that purpose unless it pertained to the placement of a foster child or an adoption.

There was a second call, this time the grievant acknowledged making it, about two hours after the first call on January 28, 2010. The grievant asked about recoding his absences prior to his arrest as FMLA. The grievant indicated credibly that this was due to his medical treatment in Peru and that if these were re-coded his attendance points would drop commensurately.

There was yet a third call that day some three minutes later again from someone claiming to be the grievant asking again about recoding the November 26, 2009 call as FMLA. The grievant denied making this call. This will be discussed more below but there was no evidence that the company acted to recode the November 26, 2009 absence as FMLA based on this call even if the grievant did make it.

The evidence also showed that the incident in Peru was not the grievant's first brush with the law in a foreign country. He was arrested and incarcerated for some 15 months while on a trip in the Dominican Republic in 2005 and 2006. He was in jail there for approximately 15 months and his absence was treated as a "withhold" status. See also Union exhibit 2, Tr. at 359-360.

Mr. Trautman also corroborated that, in his experience, when a flight attendant is in jail starting during a layover and informs the company they are placed on withhold status and that this absence is not counted against a flight attendant's attendance points. They thus have no incentive to call in sick or to attempt to hide their incarceration from the company. The grievant's situation in Peru was thus similar to that in the Dominican Republic from several years before in that he was in jail. There was also evidence that he understood that his mother had advised the company of his incarceration in January 2010 so he did not re-advise them of that on January 28, 2010 when he made the call or calls to the FASC.

Moving ahead again to the spring of 2010, the evidence showed that the grievant was moved to Laringancho prison, which was even worse than Huaral prison. There the grievant had an even more difficult time getting calls or messages out. He also testified that he was still unaware of the allegations of fraudulent use of sick leave at this time.

There was evidence that the grievant contacted his union representative to get the attendance issues resolved. The grievant's mother reached out to the union representative on March 12, 2010, see Union exhibit 4, to inquire if she had spoken with the company to get the attendance issues resolved. Ms. Washington testified credibly that she spoke with Ms. Howell and believed that the attendance issue had been resolved. Tr. at 269-273. She also indicated that Ms. Howell did not as of that time bring up the question of fraud or lying about sick leave.

Ms. Howell determined that based on these facts that the grievant had in fact made the calls in November 26 and December 24, 2009 to report in sick and that he had tried to cover that with a subsequent call trying to recode his absences as something they were not. She acknowledged though that she never spoke to the grievant prior to sending the termination letter that was served on him in person in Luringancho Prison in May 2010.[3]

Finally, the grievant was acquitted of all charges and released from prison on July 13, 2011.[4] The union seeks back pay and benefits from that date. It is thus against that factual backdrop that the analysis of this case proceeds.

---

[3] Corporate security met with the grievant personally on May 17, 2010 to hand him the termination letter. That letter sets forth the allegations of violations of Rules 16 and 34 as the basis of his termination.

[4] There was evidence that the grievant had actually been acquitted prior to that date but for whatever reason was not released from prison until July 13, 2011.

## WAS THERE ADEQUATE PROOF THAT THE GRIEVANT MADE THE CALLS ON NOVEMBER 26 AND DECEMBER 24, 2009?

The essence of the company's case is that the grievant was dishonest and that he fraudulently called into the company to report that he was sick when in fact he was in jail in Peru. The company asserted that it cannot trust the grievant and that once trust is lost it cannot be regained in this industry. The basis of course for this claim is whether there was sufficient proof that the grievant in fact made those calls. Without adequate proof of that critical fact the company's case cannot be sustained.

There was no direct evidence of the operative calls. For example, no one testified that they took the call and recognized the grievant's voice or the like. As noted above, while it is clear that someone made these calls there was no direct evidence on this record to establish that the grievant made them. In fact, as discussed below, there was considerable evidence that someone else claiming to be the grievant made the calls and that the grievant could not have made them himself since he was in jail without access to a phone in Peru.

Thus, the company's case must rest on whether there was sufficient circumstantial evidence to establish that the grievant made the calls. It was clear that the person who did make those calls identified themselves as the grievant and had the grievant's password. Further, it was shown that the dates in question are difficult to drop due to their proximity to major holidays.[5]

Normally, this kind of evidence would provide strong support for the conclusion the grievant in fact made the calls. Circumstantial evidence can be compelling; sometimes even more so than direct evidence. However, where there are equally plausible conclusions to be reached from known or stipulated facts, the party with the burden of proof does not prevail, irrespective of whether that burden is by clear and convincing evidence or by preponderance.

___

[5] The company asserted too that subsequent events, i.e. the calls made in January 2010 regarding recoding the absences to FMLA, may also bolster their case. These will be discussed below but did not provide the sort of evidentiary support the company seeks here.

To be sure, the mere fact that there may be "other" scenarios posited by a party does not necessarily carry the day. There are almost always *some* other possibilities for what could potentially have happened, some more far-fetched than others. The question is whether there are equally *plausible* scenarios that can reasonably lead to the conclusion that the grievant is not guilty of the charges raised by the employer.

Here the obvious facts are that the grievant was in prison at the very time these calls were made. There was no question that he had little or no access to a phone at that time. Further, the grievant had engaged several trip traders to drop or trade his tips during his extended absence in Peru.

As noted above, the grievant felt there was nothing wrong with this nor with the grievant giving out his password to the trip trader to facilitate those trades. There was also evidence that a trip trader may well have had some incentive to call the grievant in sick without his knowledge or consent if they found it was impossible to trade the trip.

The company noted that the grievant remained responsible for those trips. The evidence showed that this is certainly true but this allegation was both not the basis for the discipline here and is a far cry from a showing of dishonesty under Rule 16 or 34. It must be remembered that the basis of the discharge was that the grievant lied and was dishonest and called himself in sick when he was not.

Moreover, and more significantly, the time line here shows that he may well not have even known of the difficulty the trip trader was having dropping his trips. The letter from Ms. Howell was dated December 10, 2009, weeks after November 26, 2009. He also did not get that letter and would have had no idea that his attendance points were in trouble because of the missed November 2009 trip. Thus there was little motive for the grievant to make a sick call for November.

Likewise the grievant still did not know of the attendance issues as of December 24, 2009 for the same reason. Thus, while there was no evidence of who actually did make the calls, the necessary implication is that a trip trader may have in order to cover the trip somehow. Further, the union does not have to prove who did make the call; it needs only successfully argue that the company did not prove that the grievant did.

The company asserted that the grievant did know that being in jail could result in the loss of his job and that he did have some incentive to lie about his true whereabouts while in Peru. The company pointed to a blog post the grievant sent when he was incarcerated in the Dominican Republic to the effect that he was "in danger of losing his job." This assertion by the company misses the point. First the blog post is of little evidentiary value in that the grievant was at the time in jail and was in danger of losing a great deal more than just his job. Moreover, this one posting does not in any substantial way demonstrate knowledge that being in jail would not result in his being placed on withhold status.

Second, it does not speak to the uncontroverted testimony from Mr. Trautman that a flight attendant in jail is placed on withhold status and that lying about it serves no purpose. That absence does not apparently count toward attendance points and there is no motivation or benefit to be derived from falsifying this information. Moreover the grievant's mother had already informed him that she told Ms. Howell where he was. The company knew in January 2010 that the grievant was in jail and should thus have placed him on withhold status at that time. Instead the company assumed without firm evidence that the grievant was lying to them about sick calls placed months earlier.

Both parties cited numerous arbitral rulings in support of their respective positions. These cited by both sides were reviewed in some detail. Invariably, and perhaps not surprisingly, they revealed in many instances very different facts with very different results based on those facts. In *Northwest Airlines and ALPA*, 94 AAR 0013 (Tsukiyama 1993) the arbitrator denied a grievance where the grievant admittedly forged military orders in order to avoid flying for the airline. The arbitrator determined that this was not only a fraud perpetrated on the US military but also on the airline.

That case involved a somewhat obvious result in that there was a very clear admission of guilt and a very clear pathway to a finding of guilt – the military verified that they had not cut those orders and the grievant, faced with this irrefutable evidence admitted his wrongdoing. Thus, the grievant in that matter was more or less caught red-handed whereas here, as noted herein, there are equally plausible conclusions to be reached from the known facts.

This is a different case both in that there was an admission of guilt and more importantly, clear evidence of guilt. Here, as discussed more below, the pathway to guilt was far less clear and fraught with other plausible conclusions that exculpated the grievant and refuted the company's claims.

In *IAM and US Airways*, 100 AAR 0133, (Zumas 1998) the arbitrator upheld a discharge where the employee had been found to have stolen batteries from the employer. The employee both refused to comply with an order to open his bag and have it checked for contraband and was found to have in fact stolen the items in question. The arbitrator found that indeed the batteries were in the grievant's lunch bag and that the witnesses who testified that they saw him put them there were credible.

This presented a very different case that involved a fact-specific determination as to which people to believe. When faced with multiple witnesses who had nothing to hide nor anything to lose from their testimony all of whom supported the claim of theft versus the grievant who alone said that "it never happened" the arbitrator believed the many over the one. Having determined that there was theft, the arbitrator applied the well-established rule that theft is a dischargeable offense.

In *American Airlines and Transport Workers # 538*, # M-1220-95 (Sinicropi 1996) the arbitrator found that the grievant stole cargo even though the video was poor quality and the testimony of some company witnesses was suspect. Even with that however, the arbitrator did not believe the grievant's story and found that for it to be true there would have had to have been a wild set of circumstances that simply strained credulity.

Here however, while some parts of the grievant's story may sound somewhat farfetched; given his circumstances and the difficulty he had accessing any communication with the outside world, it is not so farfetched as to rise to the level of unbelievable or preposterous, as the company asserted. In fact, as noted herein, it is quite possible, even plausible that someone else made some of the calls here. It is entirely likely that a trip trader made the calls to report the grievant sick given the difficulty they were likely having trading trips so close to major holidays.

While there was no hard evidence of that, the question here is whether the company has sustained its burden of proof *on the record as it exists*. Arbitrators are not called upon to speculate but rather are engaged to draw the most reasonable conclusions from known facts and to determine if the party with the burden of proof, whether it is by a preponderance of the evidence or by clear and convincing evidence, has in fact met that threshold.[6] Here the company simply was unable to clear that hurdle.

The company further cited *IBT 2000 and Northwest Airlines*, 95 AAR 0196 (LaRocco 1995) as evidence of how seriously arbitrators treat dishonesty. There the arbitrator was faced with two flight attendants who fraudulently called in sick; one of whom had actually made the call from the airport. Slip at 10. The arbitrator was also quite concerned that their testimony at the hearing was less than truthful as well and understandably, upheld the discharges with the language quoted above regarding the seriousness of dishonesty.

---

[6] On this record it is not necessary to engage in a lengthy discussion of burden of proof or to determine if the facts would have met the preponderance standard but fell short of clear and convincing. Here the evidence failed even on a preponderance of evidence standard on this unique record. As should by now be apparent, cases rise or fall on their own facts. Conclusions reached on a factual basis on one case are of little use in a different case. That principle was never more apparent than it is here.

Here the case was again distinguishable in several material ways. First, the grievant adamantly maintained that he never called in sick, as opposed to the grievants in the *IBT 2000* case. While a denial alone does not necessarily differentiate one case from the other, the facts that the grievants in *IBT 2000* had been essentially caught on the horns of their own fabrications and that there was no other rational explanation other than that they had falsely called in sick and then met at a local restaurant was plausible. Here there is.

Second, the grievant testified quite credibly at this hearing. The company argued quite vehemently that he must be lying since there were multiple calls by someone claiming to be him and that this is just too fanciful to be true.

Each case rises on its own facts. Here the union's position is not only possible but highly probable given the grievant's situation and the fact that – for better or worse –he had given his ID information to a trip trader who may well have placed the most incriminating of these calls.[7]

The company cited *Atlantic Southeast and Assoc. of Flight Attendants*, 72-60-01-07-98 (Fishgold 1999) and argued that it is well-established that theft of time is akin to theft of anything else and that progressive discipline need not be implement. There the company performed a very thorough investigation and compared time records with computerized time entries in a parking lot and determined that the grievant was in fact failing to show up for work and was falsifying time records.

The arbitrator ruled "the record reflects just cause for the company to terminate the grievant's seniority rights. The company has unequivocally shown that the grievant filed false time records ... The union does not contest these discrepancies, but rather, argues that the discrepancies do not constitute 'dishonesty." Slip op at 13.

---

[7] The company also argued that the grievant remained responsible for his trips even though the trip trader was unable to off load them. That may well be true and the grievant acknowledged that but on this record, this is something of a red herring. The company did not terminate the grievant for missing his trips – it fired him for out and out dishonesty and lying about being sick when he was not. The issue before this tribunal is whether there is just cause for termination for those charges. On this record, there is not as discussed at some length herein.

35

The arbitrator rejected the union's arguments that the grievant simply misunderstood the time reporting requirements and ruled that these were intentional falsifications designed to cover being absent from work while claiming pay.  The arbitrator also rejected the argument that the grievant should be reinstated because this was a first offense, ruling that this was such a serious offense that it warranted discharge immediately.  Arbitrator Fishgold cited Arbitrator Zumas' opinion in *Northwest Airlines*, to the effect that once trust is lost just cause to terminate is appropriate.  Slip op at 18.

There the union conceded that the grievant falsified time records and failed to appear for work even though submitting time records reflecting that she did was theft of time pure and simple and the arbitrator rightly recognized that fact.  The company did a very thorough analysis comparing time records and parking lot entry records as well as other information and essentially confronted the union and the grievant with these forcing them to agree to the fraud.  The singular question in that case was whether that rose to the level of just cause.

Here the facts are quite different.  There is no compelling evidence of fraud as there was in *Atlantic Southeast*.  The company's argument in reliance on this case and others like it is that there is undeniably fraud and dishonesty and proceeds to the next step of asserting that such an offense warrants dismissal.  Theft *is* a serious offense and generally *does* warrant termination on a first offense irrespective of length of service and work record but the theft and dishonesty must be proven first before reaching the second question in such an analysis.

Here the facts did not support the first leg of the company's case, obviating the necessity to reach the second.  See also, *Northwest Airlines and IAMAW #143*, COFPS 93-34 (Eischen 1994), the arbitrator upheld discharge where it was shown that the grievant fraudulently obtained airline tickets for herself and a companion.  There too, there was little question of the offense and the evidence showed that the grievant was clearly guilty.  The question there too was whether that proven offense warranted discharge.  The arbitrator held that it did.  The analysis here applies to that case as well.

Arbitrator Eischen noted that when subjecting the testimony to "acid test of reason and consistency" the grievant's story fell apart. That was a recurring theme in the company's case here and the multiple cases cited for the same or similar proposition confirmed that indeed, arbitrators in assessing the credibly and plausibility of witness testimony should and frequently do, look to consistency with other testimony, documents or common sense.

For example the arbitrator in *Cameron Iron Works and IAMAW* 73 LA 878 (Marlatt 1979) was so incredulous of the grievant's claim that he characterized it quite literally as "bull s**t." He further opined that if the union believed the grievant's story it must therefore also believe in the "tooth fairy and Santa Claus."

No such colorful language or pithy metaphors are necessary in this analysis. The real question is whether there are equally plausible conclusions that can be reached from the same set of known facts, many of which are undisputed here. On this record, there clearly are.

The grievant was in jail, had limited or no access to cell phones or computers, despite the company's assertion that he had "leisure time" while in prison.[8] Further, since the grievant's mother had told the company where he was there was little reason for him to tell them that again and no reason to believe that he was in danger of losing his job because of it. He had been placed on withhold before and reasonably assumed he would be treated that way again.

## THE JANUARY 28, 2010 PHONE CALLS

The company pointed to a series of three calls placed to the company in late January, two days after the call between Ms. Howell and the grievant's mother, as supporting its claim that the grievant was attempting to hide something and that he made the original sick calls in the first place.

---

[8] That assertion made at page 39 and 42 fn. 15 of the company's brief was troubling, not only because it was not explored thoroughly at the hearing but also because it bordered on the insulting given the clear evidence of the conditions in the Peruvian prison in which the grievant found himself for many months. The company also made assertions regarding the grievant's activities while in Peru and characterized them as being engaged potentially at least in the making of pornographic videos. This assertion was given no weight not only because it was not raised at the hearing but also because it is of no relevance in this proceeding. Judging morality is not within the purview of this case and the grievant's activities outside of work whatever they were is not at the heart of this case.

In the first, the caller inquired whether FMLA could be used for legal reasons. He was told that FMLA could not be used for legal reasons unless it involved adoption or placement of a foster child. The second dealt with the whether the grievant could recode his October absences, i.e. those before his arrest, as FMLA. The third call that day was about whether the grievant's November and December absences could be treated as FMLA.

The company claimed that these calls were highly suspicious and more importantly that the grievant must have made them. Several evidentiary and logical concerns arise from this assertion. First, the company argued that a caller asked about whether FMLA could be used for legal reasons and that this implies that the grievant was trying to hide his tracks. The grievant would have known that it could not be, given his previous incarceration in 2005 and 2006.

Second, and perhaps more importantly, the grievant had no incentive to seek FMLA for the time of his incarceration. Consistent with the testimony of Mr. Trautman, he felt that if a flight attendant finds themselves in legal trouble and in jail they need only advise the company and are placed on withheld status. Those days are not counted toward the attendance points. Tr. at 204-206.

His credible and persuasive testimony undercut the company's claim that the grievant engaged in a series of phone calls designed to falsify records. Once again, while it may be that a trip trader did this – although it was not clear why that would have been done in January to cover dates in November or December – it strains credibility somewhat that the grievant would have had access to his records while in jail in Peru at a moment's notice sufficient to make the first call, see that the records had been changed and then make yet another call to get the time covered by vacation and then make yet another call to question the revocation of that. The essential question here is whether there was sufficient evidence to establish that the grievant made the calls in November and December.[9]

---

[9] The company tacitly recognized the difficulty of establishing this crucial fact in its argument here and even while arguing for termination noted in several places that "the grievant *or someone claiming to be the grievant*" made the calls. See e.g. company brief at 20 fn. 6, page 24. (Emphasis added). The unique and specific facts here supported the union's claim that indeed in many cases it was the latter and that this person was acting without the knowledge or direction of the grievant – who was admittedly in prison with limited access to phones or computers.

The company asserted that the grievant's testimony to the test of reason and reasonableness, on this record, the grievant's story does make sense, despite the company's quite vehement argument to the contrary. It is quite plausible that someone else made the calls. There was inadequate evidence that the grievant was dishonest under Rules 16 or 34 to warrant his discharge on these facts.

Moreover, merely asking the question does not result in a conclusion that he fraudulently called himself in sick in November and December 2009. In addition, the grievant by January 28, 2010 may well have known (through communication with his mother) what his attendance points were and that he needed to do something to get them down. His mother testified that she made him aware of that fact and it would thus have been reasonable for him to try to contact the company as soon as he could to get that dealt with and inquire about getting the October 2009 absences recoded.

The third call is somewhat more troubling in that the evidence showed that the request was to recode the November and December absences that are the focus of this case. Two possibilities exist. First, that the grievant did not make the calls and somebody else did. If that is the case no further analysis is needed. A trip trader might have made that call but that is unlikely.

In the alternative, even if the grievant did make the third call that day and inquired about those days; that fact, even if proven, would not necessarily lead to the conclusion that he made the original calls under these unique circumstances. Further, even if the grievant made the third call on January 28, 2010, merely asking to recode the November and December absences as FMLA does not prove that he fraudulently called in sick as alleged here.

## RESPONSIBILITY FOR THE MISSED TRIPS

The company argued too that the grievant must be held responsible for the trips he missed and that were not traded. The company argued that whether the grievant made the calls or not he was responsible for those trips. That appears to be true – the flight attendant is responsible for scheduled trips and if they cannot be dropped or traded somehow, they must take them - but here that is not the question and was not the basis of the company's decision to terminate the grievant. The basis was that he falsely reported he was sick.

The company also asserted that one simply cannot believe that the grievant did not make the calls since he did not assert that until well after the termination action was taken in May 2010. He could have told Ms. Howell that he did not make the calls but he failed to do so.

The mere fact that he did not raise his defenses until well after the termination action does not control the result here. As discussed more below, the issue here is whether he had the opportunity to make these allegations prior to the termination action. The other obvious fact there is that nobody talked to the grievant before firing him and to make it clear what the basis of the termination was. Simply stated, he never had the chance to explain any of this until after the company fired him.

Finally, whether he remains responsible for the missed trips was not the basis for the discharge. See company exhibit 11, Notice of Discharge. On this record, the fact that the trips were missed does not provide just cause for the termination.

## DISCLOSURE OF ARREST UNDER RULE 34

The company asserted that Rule 34 creates an obligation to disclose any criminal arrest. The rule however does not say that nor was there any evidence that this is the way it has been enforced or applied. The rule simply says that "Employees charged with a criminal offense, on or off duty, may immediately be withheld from service." That language does not create an obligation on the part of the flight attendant to disclose any arrests.

While it may be in the flight attendants interest to disclose it given that once that happens the flight attendant may be withheld from service – as was the case during the grievant's prior arrest in Latin America several years before. The evidence showed that being withheld from service does not count against a flight attendant's attendance points so frankly it would have been in the grievant's interest to disclose that since there was no evidence that the arrest had any connection to his employment or his duties as a flight attendant.

Further, the company asserted that criminal activity on or off duty will be grounds for dismissal. Without getting into whether or not this rule is in fact overbroad as having little or no nexus to the employment relationship for off duty criminal activity; suffice it to say that on this record there was insufficient evidence to support the claim that "any" criminal offense results in dismissal. The evidence here showed that this is not the way the rule has been enforced – it was certainly not enforced against the grievant when he was arrested earlier and spent several months in jail in another country.

More importantly, this was not the basis of the termination. The basis of the discharge is that the grievant was dishonest in calling in sick. Company exhibit 11 sets forth the basis of the discharge as follows: "Company records show that you called in sick from November 26, 2009 to present, when in fact you were incarcerated and unable to report to work. This action constitutes fraudulent use of the sick leave policy."

In fact no one called the grievant in sick for that entire time, but rather for distinct days. This was a clear mistake in the termination letter. Moreover, there was clear trip trading activity in December 2009. The union introduced compelling testimony that one cannot trade trips if they are on sick leave. Had he been on sick leave for that time he would not therefore have been able to trade trips nor would the trip trader have been able to do so even with the grievant's password.

## COMPANY'S INVESTIGATION

The union asserted that the company's investigation was inadequate and did not even include a discussion with the grievant to A) ensure that he was aware of the charges against him and B) so he could provide his side of the story.  Indeed, Ms. Howell acknowledged that she had not spoken to the grievant between the time he went to Peru and the date of the termination letter.  This is not to say that the company has the obligation to visit every employee who is arrested in whatever jail they may be located.  Here however the record showed that the company could have simply placed the grievant on withheld status, as it had before, and awaited a resolution of the issues in Peru.

One of the cardinal considerations in any just cause analysis is whether there was an adequate investigation made by the company to determine the facts.  There is no hard and fast rule on this question but the essential inquiry is whether the company had sufficient facts to lead to the conclusion that discipline is warranted.  Some investigations can be done quickly and with a cursory review of the facts and that will be enough.  Others require more than what was done here.

Several issues arose.  First, the grievant was in jail and could not communicate regularly with anybody.  The company argued that he could have notified the company in a more timely fashion that he was in jail but that argument was unsupported by the facts.

Second, the company did not even speak to the grievant before deciding to discharge him.  As discussed herein, this was a misstep.  Discharges must be made on hard evidence or clear circumstantial conclusions from known facts.  They must not be made on conjecture or assumption – however valid they might appear at the time.

The evidence here showed that the company did not talk to the grievant or confront him with the allegation that he made fraudulent sick calls until after they fired him. There is thus considerable merit to the union's claim that there was an inadequate investigation done in this case. The essential problem is that the company made assumptions about the grievant's actions and about his motives all without talking to him and, more importantly, without giving him adequate notice of the charges against him before terminating him.

Obviously, it was difficult if not impossible for Ms. Howell to contact the grievant or speak to him directly. Of that there was little question. The company did however use corporate security to meet with him to give him the termination notice in May.

Further, there was no compelling reason to terminate the grievant in May 2010 and therefore no compelling reason not to await a chance to get the grievant's side of the story. The company had placed the grievant on withheld status before when he was in jail in 2005-2006 for a period of some 15 months. There was no evidence that it could not have done so here after it became aware of the incarceration in January 2010. While Ms. Howell acted on the facts she had at the time given the difficulty of communication with the grievant, these facts were insufficient to establish the charges for which the grievant was fired.

One thing becomes crystal clear in this case in that there was a failure to communicate. This was frankly through no fault of either party. The grievant was in jail; and Ms. Howell could not reach him because he was in jail. While her assumptions about who made the calls and what the grievant was actually up to may have seemed reasonable to her at the time they were just that – assumptions.

As is clear from reviewing the many cited cases provided by both parties here, when terminations are upheld they are the result of good "detective" work by the company. In many cases that work is so good that the employees are essentially "cornered" and find they have no valid excuse or explanation for their actions – they are caught red handed.

Likewise, in many of the cases where the union is successful in demonstrating that there were less than perfect investigations, the results are often the opposite and the discharges are overturned due to lack of sufficient evidence.

Here the difficulties in performing the investigation that would have provided a clearer picture of what actually happened were due to factors beyond either the grievant's or the company's control but that does not absolve the company from waiting to fire someone until they have all the facts nailed down. Thus, the union's assertions regarding the investigation are valid.

At the end of the day several things conspired to support the union's case and undercut the company's. There was simply inadequate proof that the grievant made or caused to be made the actual calls for which he was fired. Second, the calls made later in January 2010 even though they appeared to be curious to the company at the time, did not provide adequate proof of the original calls in November and December.

As in virtually any discipline matter, the result is based on the unique facts presented and whether on the record presented the employer has met its burden of proving just cause. This case is no different. The result here is based on the conclusion that the company failed to prove by a preponderance of the evidence that just cause existed for the grievant's termination. That conclusion, as discussed above, was based on the failure to prove that the grievant made the allegedly fraudulent sick calls as alleged in the termination notice.

Third, the inconsistencies in some of the stories are easily explainable by the passage of time here – these events occurred in late 2009 and early 2010 – the hearing was in August 2013. The company asserted that the grievant's mother was inconsistent. Further, reference to older documents – such as those referring to FMLA for the grievant's grandmother as opposed to his mother - did little to shake this story. It was not the subject of discipline at the time and was of little evidentiary value here. It certainly was not strong enough evidence to impeach the grievant's subsequent testimony.

Fourth, the grievant had no incentive to hide his incarceration. He believed that he would have been placed on withhold status just as he was in 2005 and 2006. His mother told the company about it in January 2010. He started a blog – or tried to – while in prison and tried to get his message of false imprisonment out to the world in every way he could – he hardly made his incarceration a secret. His mother wrote to public officials in both the US and Peru and tried to publicize his plight in various ways. More importantly, the facts here supported the claim that the grievant never made the original calls and acted as reasonably as he could give his situation to deal with the attendance point issue and to advise the company of his situation.

When viewing this case in its totality and the record as a whole, the union's and grievant's version of events is at least as likely, if not even more likely than those of the company. Thus, on these unique facts, the company's case fails for lack of adequate proof of the charges against the grievant.

**REMEDY**

Having made the above determination that there was no just cause for the termination, the remedy is clear. The grievant is therefore to be reinstated to his position as a flight attendant as soon as practicable. His reinstatement is with back pay and all contractually accrued benefits from July 13, 2011 to the date of his reinstatement herein. Back pay is subject to standard mitigation of damages and is reduced by any interim earnings. The union and grievant shall make available to the employer any appropriate documentation to verify such earnings. The arbitrator will retain jurisdiction to resolve any issues with regard to the remedy ordered hereunder.

## AWARD

The grievance is SUSTAINED as set forth above.


Dated: December 23, 2013

APFA and American Airlines – Rodgers grievance AWARD.doc

Jeffrey W. Jacobs, arbitrator


Gregg Formella, Company Board member    1/21/14  DISSENT


Mark Moscicki, Company Board member    1-15-14  dissent


Marcus Gluth, Union Board Member    CONCUR


Suzanne Edwards, Union Board Member

CONCUR